**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,           )
                                    ) Case No. 1:15-CR-00020
                                    )            (RJA)(HBS)
                Plaintiff,          )
                                    )
vs.                                 ) January 12th, 2016
                                    )
DAMON HUNTER,                       )
                                    )
                Defendant.          )


**TRANSCRIPT OF SENTENCING**
**BEFORE THE HONORABLE RICHARD J. ARCARA**
**SENIOR UNITED STATES DISTRICT JUDGE**


APPEARANCES:

For the Plaintiff:    JAMES P. KENNEDY, JR.
                      ACTING UNITED STATES ATTORNEY
                      BY:  WEI XIANG, ESQ.
                      ASSISTANT UNITED STATES ATTORNEY
                      138 Delaware Avenue
                      Buffalo, NY 14202

For the Defendant:    CANTOR DOLCE & PANEPINTO PC
                      BY:  SAMUEL P. DAVIS, ESQ.
                      1600 Main Place Tower
                      350 Main Street
                      Buffalo, NY 14202

Probation Officer:    ALEXANDRA PISKORZ

Court Reporter:       MEGAN E. PELKA, RPR
                      Robert H. Jackson Courthouse
                      2 Niagara Square
                      Buffalo, NY 14202

US v HUNTER -- SENTENCING

1    THE CLERK:  All rise.  You may be seated.  Criminal

2   action 2015-20A.  United States vs. Damon Hunter.  Sentencing.

3   Counsel, please state your name and the party you represent

4   for the record.

5    MR. XIANG:  Good afternoon, Your Honor.  Wei Xiang

6   for the government.

7    MR. DAVIS:  Good afternoon, Your Honor.  Sam Davis on

8   behalf of Mr. Hunter.

9    THE COURT:  Good afternoon.  Sorry we're running a

10  little late, but you're not going anywhere anyway.  You look

11  out the window, it looks like we're having a little snow.  Are

12  we ready?

13   MR. XIANG:  Yes, sir.

14   THE COURT:  The defendant, Damon Hunter, stands

15  before the Court for sentencing on his previous plea of guilty

16  to one count of false declaration before a Grand Jury in

17  violation of Title 18 United States Code 1623(e).  I know,

18  Counselor, you reviewed the reports.  Mr. Davis, I assume you

19  reviewed it with your client?

20   MR. DAVIS:  Yes, Your Honor.

21   THE COURT:  The Court hereby accepts the terms and

22  conditions of the plea agreement and the plea of guilty.  I

23  will now place the report in the record under seal.  If an

24  appeal is filed, counsel on appeal will be permitted access to

25  the sealed report, except that counsel on appeal will not be

1   permitted access to the recommendation section.

2        The parties have filed the appropriate statement of

3   parties with respect to sentencing factors.  There's no

4   dispute about the facts of the report and therefore, the Court

5   adopts those facts as this findings of fact and hereby

6   incorporates them in the record.  There are no objections to

7   the probation officer's conclusions as to the applicable

8   guidelines.

9        The Court recommends that the defendant's base

10  offense level under guideline section 2X3.1(a)(3)(A) is 30.

11  Report recommends a three-level down adjustment based upon the

12  acceptance of responsibility and accordingly recommends the

13  offense level of 27 with a criminal history category of 5 as a

14  result of the defendant's prior record.

15       Under this calculation, the advisory range is 120 to

16  150 months.  The Court notes that the plea agreement

17  anticipated that the defendant's criminal history category

18  would be 4.  Under this calculation, the advisory range would

19  have been 100 to 125 months.  However, it's ultimately

20  immaterial whether the defendant's criminal history category

21  is 4 or 5 because the statutory maximum in terms of

22  imprisonment is five years or 60 months, which is less than

23  the minimum of the guideline range in either criminal history

24  category.  Therefore, the guideline range is 60 months.

25       The advisory range for supervised release is one to

US v HUNTER -- SENTENCING

3

1   three years.  The fine range is 25,000 to $250,000, plus the

2   cost of imprisonment and supervised release.  In accordance

3   with the Supreme Court decision *U.S. v. Booker*, the 2nd

4   Circuit decision *U.S. v. Crosby*, the Court must consider the

5   guidelines, is not bound by them.  The Court must also

6   consider the factors in 18 U.S.C. 3535(a).  Now, I have

7   reviewed all the submissions by the parties.  Mr. Davis?

8          MR. DAVIS:  Your Honor, I am largely going to stand

9   on my submissions to the Court, but I would like briefly just

10  to speak to my client's situation, Your Honor, specifically,

11  the chain of events which brings him before you today, Judge.

12  Suffice to say that the situation my client found himself in

13  was quite graphic, quite troublesome, Judge.  My client

14  witnessed a close friend of his being murdered, Judge.  He saw

15  that this didn't happen in a vacuum.  This isn't something

16  that he saw in a movie, that he heard about in passing.  He

17  actually was there and he saw this, Judge.

18          And it's my understanding that the gentleman who he

19  saw do this, Judge, has a reputation.  For all intents and

20  purposes, he's known as a contract killer, Judge, not with all

21  the glitz and glamor of Hollywood, but, nevertheless, the same

22  result in several instances.  People in the community who were

23  killed by this gentleman, my client was privy to that.  And if

24  he didn't believe those rumors, he had firsthand demonstration

25  of what this man was willing to do.  So, that was in my

1    client's mind when he first came in contact with police.

2          This gentleman also fired upon my client and tried to

3    take his life, Judge.  My client had to roll under a running

4    vehicle in an attempt to save his own life.  So, when he went

5    to police officers, his mindset -- I can't imagine what he was

6    thinking at that moment in time, Judge.  I rejoice when I make

7    it across the street safely when jaywalking.  He dodged

8    several shots after seeing his friend killed in front of him.

9    So, he went to the police officers and he told them what he

10   thought he needed to tell them to save his life.

11         Now, Judge, my client represented to me that he was

12   told that he would be able to do this in a vacuum, that it

13   would not come back to bite him, that he would not have to

14   stand before people from the community and this gentleman and

15   regurgitate what happened in front of an open courtroom,

16   because he believed that that would lead to his detriment as

17   well as the one's he loved, Judge.  Nevertheless, a sting was

18   developed.  He was actually placed in that situation where he

19   was asked to recite what had happened.

20         Now, as the Court knows, during this time, my client

21   was in State custody.  And as the Court, I'm sure, is aware,

22   there is a great level of communication between people in

23   prison and people on the street.  The individual who he

24   witnessed commit this crime, Judge, has a network of people

25   who actually had contact with my client.  And Mr. Wei was

1    prepared to present as evidence a letter which demonstrated

2    that there was an actual conversation, a quasi-tribunal taking

3    place within prison walls where my client's fate was being

4    decided, because it had gotten out in realtime that, in fact,

5    he had spoken with police officers and that the government

6    sought to use him as a witness.

7          Around that time, my client's relatives were being

8    approached on the street by people who had weapons and threats

9    were made; very real threats.  My client found himself in a

10   situation, Judge, where he felt as though the lives of others

11   would be at stake and this caused him to break the law in that

12   he recanted his earlier statements, Judge.  And that's what

13   brings us here today, Your Honor.

14         He wasn't predisposed to being a witness, Judge.  He

15   wasn't -- he's not a violent man.  If you look at his history,

16   it's not replete with incidents of violence.

17         THE COURT:  Well, he was convicted of robbery and

18   possession of a weapon.

19         MR. DAVIS:  Well, the possession of a weapon charge.

20         THE COURT:  Yeah, but it was robbery of first degree,

21   Class B felony.

22         MR. DAVIS:  Understood, Judge.

23         THE COURT:  It's amazing he went from a first-degree

24   robbery, which is a Class B felony and apparently guilty, to a

25   disorderly conduct.

```
 1          MR. DAVIS:  Right, Judge.  And I think that speaks
 2   to --
 3          THE COURT:  I don't understand the facts of that one
 4   at all.  That's amazing that someone could be charged with a
 5   Class B felony and then pleaded someone to a disorderly
 6   conduct, but that didn't even count in the criminal history
 7   category.  It was zero points for that.
 8          MR. DAVIS:  Understood, Judge.  I'm speaking to the
 9   weapons charge, which he's currently incarcerated on.  And
10   that charge happened -- that incident happened after he
11   witnessed this killing.  He felt the need to be around a
12   weapon because he knew that this gentleman wanted him dead.
13   That was a very real threat for him, Judge.  I know in this
14   courtroom and in the lives we lead, it might be hard for us to
15   comprehend that there is a person who wants to kill you, a
16   group of people who actually want to kill you and who have the
17   ability to do so, but that's the situation my client found
18   himself in.
19          Being unemployed, not being a person with vast
20   resources where he could leave, he didn't have those options.
21   He already had gone to the police.  He sat in the police
22   station surrounded by police officers and told them what he
23   knew, only to have that information come back to him, repeated
24   accurately and then to be threatened because of what he had
25   told officers.  That's the situation my client found himself
```

1   in when he decided to say that he was mistaken about the

2   gentleman that he identified.

3          My client is still in the State custody, Judge.

4   That's his reality, Your Honor.  He's repentant for what he

5   did.  He realizes that he violated the law.  He never wanted

6   to be in the situation.  He wasn't responsible for the events

7   which triggered his friend being killed.

8          And Judge, I just ask the Court to impose the minimum

9   sentence possible and to afford him the opportunity to serve

10  whatever sentence the Court imposes concurrently, Judge.  He's

11  already had his pound of flesh taken for this.  He's already

12  suffered for this chain of events.

13         The weapons charge, which he's currently serving

14  State time, is a direct result of this event.  He stands here

15  before you today because of this event.  He's lost his friend

16  because of this event.  His family is less safe because of

17  this event.  He's less safe because of this event.  We would

18  ask the Court to take all that into account and sentence him

19  accordingly, Your Honor.

20         THE COURT:  All right.  Sir, this is your opportunity

21  to say anything you'd like to say.

22         THE DEFENDANT:  Yeah.  Well, I just want to apologize

23  to wasting everybody's time.  It's obvious that if I were to

24  just told the Grand Jury about what happened on that day, I

25  wouldn't be here.  But just when these dudes killed my

1   brother, I was just like -- and that he was questioned about

2   what I was telling them, that just was, like, enough for me to

3   just, like, say no.  I backed out.  I backed out at the last

4   moment.  And now, it's like, the safety and security of my

5   family is involved.  It was a hard decision for me, but I just

6   backed out at the last moment and I know I can't take it back.

7   What's done is done.  I have got to face the music.  So, you

8   know, that's basically it, Judge.

9          MR. XIANG:  Your Honor, the government is not

10  unsympathetic to Mr. Hunter's situation and I wouldn't dispute

11  almost any of the facts or the proffer that counsel has made

12  except for that the firearm conviction he has now was

13  somewhere related to his fear of the defendant.  I don't know

14  about that, but there's no indication that I have of that.

15          But there are two concerns that the government

16  believes is important with respect to the 3553 factors,

17  sentencing factors, about affording adequate deterrence to

18  criminal conduct, as in general deterrence for this type of

19  crime, because Mr. Hunter is not the only person who has ever

20  found himself in this situation and he's not going to be the

21  only one who ever will.  This is not unique to the kinds of

22  cases that we'll have, the narcotics, racketeering, the gang

23  violence cases that are coming out of the West and East Sides

24  of Buffalo at least every year.

25          The first is, respect for the authority of the Grand

1   Jury subpoena.  There was, as according to the plea agreement

2   and as adopted in the presentence report, one of Mr. Hunter's

3   concerns was that he wasn't going to get credit on his State

4   gun case for testifying before the Federal Grand Jury.  And,

5   frankly, Judge, that he was under a Grand Jury subpoena.  He

6   was a civilian witness, an eyewitness to a crime.  It's not

7   like he was a participant who might have some sort of Fifth

8   Amendment concerns or might need something, some benefit, some

9   promises in order to come in and talk about what he was a part

10  of.

11          He was a witness, a victim, just like anybody out on

12  the street would have been.  And if people out on the street

13  who have no criminal histories, no criminal contacts get a

14  Grand Jury subpoena, they have to come in and they have to

15  testify.

16          Mr. Hunter was in no different position, even though

17  he had a -- he was in jail and he had a pending case.  They

18  were unrelated and he should not and the government would not

19  have -- we weren't going to give him any credit for simply

20  coming in because that's what -- he was under a Grand Jury

21  subpoena and he needed to comply with it.

22          Now, if he didn't want to comply with it, he had an

23  option.  He could have still respected the need to tell the

24  truth by simply saying, I don't want to testify.  He could

25  have come before Your Honor on either a civil contempt or some

1   other recourse and the Court would have simply have to decide

2   whether or not what sanctions to impose, what recourse to take

3   with respect to whether or not Mr. Hunter was going to be

4   forced to comply with the subpoena.

5           THE COURT:  Did he have an attorney with him at the

6   time?

7           MR. XIANG:  He did have an attorney for one proffer.

8   He was represented.

9           THE COURT:  At the time of the Grand Jury?

10          MR. XIANG:  I'm sorry?

11          THE COURT:  At the time of the Grand Jury proceeding?

12          MR. XIANG:  At the time of the Grand Jury, he had an

13  attorney on the State case, but not assigned as to the Grand

14  Jury matter because --

15          THE COURT:  Federal Grand Jury.

16          MR. XIANG:  That's correct, Your Honor.  Because he

17  was not -- there was no privilege for him to invoke in terms

18  of self-incrimination.  And we never got to the point.  If he

19  had refused to comply with the subpoena, then we may have come

20  before the Court and he would have had a counsel appointed for

21  that.

22          As noted, we even had to apply reasonable force order

23  to bring him out of jail to come to the Grand Jury because he

24  had refused to comply once.  So, there was certainly -- he

25  knew that there were options to not simply coming to the Grand

1   Jury and lying.  And you know, other people did come.  The

2   person he speaks of is, the Court may be aware, is indicted

3   for murder in aid of racketeering, racketeering conspiracy,

4   and other charges and a pending indictment here is still

5   before Judge Scott on pretrial motions.

6          But he was indicted.  There were other witnesses who,

7   you know, risked the same harm to their livelihood, to their

8   families to come in to testify to either comply with subpoenas

9   or other means to obtain their testimony for the Grand Jury.

10  They testified at the Grand Jury and they are expected and

11  they will testify at trial, if there is one.

12         So -- and what Mr. Hunter did is now create a

13  *Giglio/Brady* material that is going to last through the

14  entirety of the case.  It may not have affected the fact that

15  there was an indictment, but now this recantation that is

16  going to linger over the entire case, regardless of whether or

17  not he testifies in the future, because it would impeach any

18  other witness who testifies differently to the truth.

19         So, there was a lot of trouble that was created

20  because of this decision by Mr. Hunter.  And you know, I don't

21  necessarily believe that a fully consecutive sentence, five

22  years stacked on top of the seven years that he's already

23  doing, is necessarily the most appropriate, but I do think

24  that there is a need for the Court to recognize that there are

25  consequences to him and there ought to be enough to provide

US v HUNTER -- SENTENCING

1   general deterrence to every other prospective witness who

2   might be coming in.  Because after all, it's the witnesses,

3   the testifying witnesses and the expectation, the oath they

4   take to testify to the truth that really is the backbone of

5   every single case of the criminal justice system, you know,

6   DNA, exhibits, physical exhibits.

7          They are great and all, but chain of custody,

8   relevance, all of those things depend on someone getting up

9   here under penalty of perjury, swearing that what there saying

10  is true, accurate.  And that is what people are indicted on

11  the basis of and that is what defendants are convicted on the

12  basis of.  So, in order to sentence -- you know, it would be

13  up to -- in the Court's wisdom to decide what is the sentence

14  that is appropriate in order to advance those interests.

15         THE COURT:  What are you recommending?  Are you

16  opposed to the concurrent sentence?

17         MR. XIANG:  It is a difficult case for us.  I don't

18  think a fully consecutive sentence is appropriate.  I don't

19  think a fully concurrent sentence is appropriate because then,

20  really, it's as if nothing happened.  In the future, he might

21  be a criminal history category 6, but it really doesn't --

22         THE COURT:  How would you justify a non-guideline

23  sentence here?  What would you say -- you are apparently, as I

24  understand what you're saying, is that a sentence of

25  incarceration is appropriate here, Judge, maybe not the

1   guideline range, but maybe some other range, but it should be

2   run consecutive so there is some form of punishment for lying

3   before a Grand Jury because the Grand Jury is such an

4   important part of our criminal justice system.  There's no

5   question about it that it is.  It's critical that people

6   testify honestly and truthfully in order for our system to

7   even work.  And people to come in and commit perjury, the

8   system itself will suffer greatly as a result of that.  So,

9   what are you suggesting?

10              MR. XIANG:  Judge, the guideline sentence of

11  60 months is -- well, one, the plea agreement binds both

12  parties that that's what we're asking the Court.  It's whether

13  to run it partially concurrent or fully concurrent.

14              THE COURT:  What's partially concurrent?  I don't

15  know what that means.

16              MR. XIANG:  The --

17              THE COURT:  Partially concurrent?  What do you do?

18              MR. XIANG:  That's is what the guidelines --

19              THE COURT:  Partially concurrent.

20              MR. XIANG:  To provide for that it's -- could be run

21  partially concurrent, if the Court were --

22              THE COURT:  Partially concurrent?

23              MR. XIANG:  Partially concurrent, partially

24  consecutive would be what --

25              THE COURT:  How would you frame a sentence?

1          MR. XIANG:  That would be difficult.

2          THE COURT:  That's up to me.

3          MR. XIANG:  Starting at a particular time and then

4     lasting until the end.

5          THE COURT:  Why don't you come on back here at 1:30?

6     Let me think about this.

7          MR. DAVIS:  Judge, there were just a couple of things

8     that I want to address in what counsel said, if possibly.

9          THE COURT:  Go ahead.

10         MR. DAVIS:  Judge, with regard it my client wanting

11    credit for his testimony, the credit which he sought -- bear

12    in mind, my client has a 10th grade education, Judge.

13         THE COURT:  Is what?

14         MR. DAVIS:  He has a 10th grade education.  So, he

15    isn't as learned as counsel and able to make legal strategic

16    decisions, if you will, as to how to avoid testifying.  But

17    nevertheless, Judge, when he sought credit, the credit he

18    sought was to not have to go to jail with the very people that

19    he was about to testify against because he feared reprisal.

20         And he wanted to be able to actually leave the area.

21    I think that he finds himself in a little bit of a different

22    situation than the average person who testified.  Who's

23    helping him testify, I don't know who these people are.  My

24    client was one actually -- he actually grew up around this

25    gentleman.  So, this gentleman knew his habits.  He knew where

1    his family lived.  He had a great deal of information about my

2    client and his family.  And this gentleman, once again --

3            THE COURT:  Yeah, but this happens all the time in

4    this world that unfortunately we live in.  I mean, people that

5    are involved and testifying and involved around and maybe

6    sometimes part of the criminal justice system are always

7    subject to this kind of -- you might say fear or a better word

8    probably would be harm that might come to them.  It happens in

9    the prisons.

10           MR. DAVIS:  This is true.

11           THE COURT:  It's a big problem in the United States

12   right now is individuals who have cooperated with the

13   government getting access by other inmates through the 5Ks, or

14   whatever, whether the person cooperated.  Okay.  I understand

15   that.  How long is he -- what is the state sentence?  I can't

16   find that in the pretrial --

17           MR. XIANG:  It's a seven-year sentence, Your Honor.

18   He's been in since early this year.  I think he's due for

19   parole -- he's eligible for parole in 2019.

20           MR. DAVIS:  Yes.  And that's --

21           THE COURT:  Where is that?  Is that in the report

22   somewhere?

23           MR. XIANG:  It's paragraph 46 on page 16.  He's

24   eligible for parole on October 10th, 2019.

25           MR. DAVIS:  And, Judge, I would like to also point

US v HUNTER -- SENTENCING
16

1    out that this case here had to be answered for when he appears

2    before the parole board.  It's not like if he receives a

3    concurrent sentence that he will not necessarily not feel the

4    effect of that, because in 2019, he'll have to sit before a

5    board with individuals who may decide that he should, in fact,

6    spend --

7            THE COURT:  Where did you come up with the 7/19 -- or

8    2019?

9            MR. DAVIS:  That's when he's eligible for parole.

10           THE COURT:  Where did you see that?

11           MR. DAVIS:  My client represented that to me himself.

12           THE COURT:  Is that in the report somewhere?

13           MR. DAVIS:  I believe so, Judge.  I don't have --

14           MR. XIANG:  Judge, it's paragraph 46 on page 60.

15           THE COURT:  It says the sentence of seven years

16   imprisonment.

17           MR. XIANG:  Judge, the bottom line.

18           THE COURT:  I don't understand this at all.  I'm

19   totally confused as to when he is eligible for parole.

20           P.O. PISKORZ:  Your Honor, at paragraph 46 of the PSI

21   in the written narrative below the criminal history entry,

22   it's the last sentence.  It says the defendant is eligible for

23   parole on October 10, 2019.

24           THE COURT:  Oh, okay.  All right.  Well, thank you.

25   I want to think about this for a second.  Come on back here

1    about 1:15.

2              MR. DAVIS:  Yes, Your Honor.

3    (Brief recess).

4              THE CLERK:  All rise.  You may be seated.

5              THE COURT:  All right.  Are we ready, Mr. Davis?

6              MR. DAVIS:  Yes, Your Honor.

7              THE COURT:  Anything further?

8              MR. XIANG:  No, Your Honor.

9              MR. DAVIS:  No, Judge.

10             THE COURT:  Pursuant to the Sentencing Reform Act of

11   1984, judgment of the Court that the defendant, Damon Hunter,

12   is hereby committed to the custody of the Bureau of Prisons to

13   be imprisoned for a period of 60 months.

14             Pursuant to Guideline Section 5G1.3(d), application

15   note 4, the sentence shall run partially concurrent in the

16   following manner:  48 months of the defendant's sentence in

17   this case shall run concurrent to the defendant's undischarged

18   State sentence of seven years imprisonment imposed in Erie

19   County Court on December 9th, 2014 under docket number

20   2013-1883.  The remaining 12 months of the defendant's

21   sentence in this case shall run consecutive to the currently

22   undischarged state sentence.

23             Cost of incarceration fee is waived.  He shall be

24   placed on supervised release for two years.  He shall report

25   to the probation office in the district in which he is

1    released within 72 hours of release; shall comply with the

2    standard conditions of supervised release adopted by the

3    Court; shall not commit another federal, state or local crime;

4    shall be prohibited from possessing a firearm or other

5    dangerous device and shall not possess a controlled substance.

6            Drug testing is required.  He shall submit to

7    substance abuse testing to include urinalysis or other

8    testing.  Details of such testing to be approved by the

9    probation office.  If substance abuse is indicated by testing,

10   he is to complete drug and alcohol evaluation and enter into

11   any treatment as deemed necessary by the probation office.  He

12   is not to leave treatment until discharge is agreed to by the

13   probation office.

14           While in treatment and after discharge from

15   treatment, he is to abstain from the use of alcohol, be

16   required to contribute to the cost of services rendered in an

17   amount to be determined by the probation office based on the

18   ability to pay or availability of third-party payment.

19           He shall participate in vocational and/or educational

20   programming approved by the U.S. Probation Office.  He shall

21   obtain his General Education Diploma; shall submit to a search

22   of his person, property, vehicle, place of residence or any

23   other property under his control based upon reasonable

24   suspicion and permit the confiscation of any evidence or

25   contraband discovered.  The Court finds he does not have the

US v HUNTER -- SENTENCING

1   ability to pay a fine, however, I will order the mandatory

2   special assessment of $100 which is due immediately.  Payment

3   shall begin under the Bureau of Prisons Inmate Financial

4   Responsibility Program.

5         In determining the sentence, the Court has considered

6   the advisory range and points raised by counsel and by the

7   defendant.  In addition, the Court has considered the factors

8   set forth in 3553(a) and finds the sentence imposed is

9   sufficient but not greater than necessary to comply with the

10  purpose of sentencing set forth in 18 U.S.C. 3553(a).

11        I have imposed a sentence within the guideline range.

12  Basically what it is, is four years is going to be concurrent

13  with the State, one year consecutive, which I believe under

14  all the circumstances and for the reasons set forth in

15  Mr. Davis's argument, there are a lot of extenuating

16  circumstances.  I was kind of inclined to make it straight

17  five years incarceration, but I understood all the factors

18  here.  They're somewhat unusual, not totally, but I figure

19  under all the circumstances, one year of incarceration is a

20  fair and reasonable sentence.

21        You have a right to -- and I think the government

22  pretty much agreed that a five-year sentence of imprisonment

23  would have been, under all the circumstances, a little bit

24  longer than may be necessary.

25        MR. XIANG:  Yes, Your Honor.

1        THE COURT:  You have a right to appeal the sentence,

2   if you feel the Court misapprehended its authority or imposed

3   an illegal sentence, however, you did waive your right to

4   appeal.  If you feel that waiver is not a valid waiver, you

5   may take that issue before the 2nd Circuit Court of Appeals.

6   Anything further?

7        MR. DAVIS:  No, Your Honor.  Thank you.

8        MR. XIANG:  The government moves to dismiss Count 2

9   of the indictment.

10        THE COURT:  Motion is granted.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          *     *     *     *     *     *

2

3                    I certify that the foregoing is a

4          correct transcription of the proceedings

5          recorded by me in this matter.

6

7

8

9                                   s/ Megan E. Pelka, RPR

10                                  Court Reporter,

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25